argument of the morning. This is going to be remote. It's appeal number 22-1040. We got one more coming in, Matt. Okay, it looks like we have counsel for both parties in our fourth argument of the morning, appeal 22-1040, Paul Halczenko v. Ascension Health and others. Mr. Bach, we'll begin with you. One second to bring up the volume on you. I'm having just a little bit of trouble hearing you. Okay, thank you, Your Honor. My name is Bill Bach, and I'm counsel for the petitioner Paul Halczenko. We respectfully request to reserve two minutes for rebuttal. Dr. Halczenko presents two issues for review. First, he is being irreparably harmed through losing skills indispensable to his career as a pediatric critical care physician. Second, St. Vincent Hospital will not suffer undue hardship through restoring Dr. Halczenko to his position in the Pediatric Intensive Care Unit, or PICU. Before we go too far down the road, just a preliminary question, please. The briefs before the court all say that he has not exhausted his administrative remedies here. Did you file or did your client file a charge with the EEOC within 180 days? Thank you, Your Honor. We have, and we've received a right to sue letter. Okay, so now the administrative remedies have been exhausted? Yes, ma'am. Was the EEOC charge timely filed? It was, Your Honor. Okay, thank you. I have a question similar, not the same, and mine has to do with mootness. In your brief at several points, you say that if Dr. Halczenko is not employed by mid-May, it's highly likely that he'll be unable to successfully continue his career as a pediatric critical care physician. That date has come and gone. So, to the extent the appeal's not moot, will you address why the irreparable harm injury is just not speculative? Because here we have your brief saying, if this is not remedied by mid-May, he's not going to be able to practice as a pediatric critical care physician, and I assume you're going to say, oh no, that's now false, or that, I don't mean false, but that's wrong, and he could still, he could still practice as a pediatric critical care physician, but until when and why is not all this extraordinarily speculative? Yeah, I understand your question, Your Honor. Obviously, when Dr. Halczenko testified that he believed within five months that he would lose the specialized fine motor skills to continue his career, that was an estimate based upon his 17 years experience as a pediatric intensive care doctor. And so, that's a determination that, obviously, he may not even know until he gets back in the game. It's like a baseball player that is being kept out of batting practice. Isn't that the problem, though, the irreparable harm argument? I mean, if he doesn't know, if it's all speculative, how is it irreparable harm? How does he meet his burden on that element? Well, two things, Your Honor. First of all, in DeSantos, this court said that deterioration of skills was irreparable harm in and of itself. It didn't require him to lose, necessarily, his job. However, he will lose his job within a period of time, certainly before a trial could be held in this case. Within the one to two years, at least, that it will take for a trial to occur. So, this court— Has he applied for any other full-time positions? He has. He has applied for numerous full-time positions. Obviously, at the time, about a month after this case was filed and he had been discharged and when his affidavits were filed, he had sought other positions outside the state for temporary work. He has since sought full-time positions. One thing that needs to be understood is that Dr. Halchenko is in a highly specialized field. There are only, as the record indicates, three PICUs in the entire state of Indiana. There are only a limited number, perhaps less than a thousand, such positions within the country. The American Academy of Pediatric Physicians indicates that since 1987, there have only been 3,000 PICU doctors in the practice in those 35 years. So, this is a very So, Your Honors, getting to the first issue, Dr. Halchenko's specialized fine motor skills, such as placing a breathing tube or arterial line in an infant's artery to measure the baby's blood pressure from heartbeat to heartbeat, are performed on the tiniest of human beings, only a few pounds in weight. His skills cannot be maintained by practicing in a garage or watching videos. There are no simulators for PICU skill retention. The only way his skills and, therefore, his career can be retained is through constant repetition in a PICU. And the district judge agreed, finding Dr. Halchenko has submitted evidence that his specialized skills will deteriorate during the pendency of this case. The lower court concluded, the harm that Dr. Halchenko has sufficiently established, atrophy in his medical skills during the pendency of this The district court's inconsistent findings that the skills necessary for Dr. Halchenko to maintain his career were atrophying, but that this did not constitute irreparable harm or irreconcilable and clear error, particularly with no record evidence rebutting Dr. Halchenko's testimony that atrophy is likely to cause him to lose his career. The court speculated... What did the record show about the nurses that had been called back? Thank you, your honor. The record showed that two PICU nurses were called back to work with the tiniest, most at-risk infants in the PICU. And the record demonstrates that those individuals being called back, in our opinion, explodes defendant's risk theory and any undue hardship claims. Okay, perhaps. But does it help your client on the religious discrimination claim? In other words, weren't those two nurses, were they Evans and Freilich? Yes, your honor. You're absolutely correct. And I think what we have to recognize here is that Dr. Halchenko has established a prima facie case. The burden then shifted to the hospital to demonstrate why he was terminated and how this would cause undue hardship. And they've completely failed... How has he made a prima facie case of religious discrimination though? Because if his theory of liability was correct, they would have never invited the nurses back. Well, he's a member... If they wanted to discriminate on the basis of people invoking a religious exemption, you'd hardly invite them back. You'd keep the nurses in the same position that your client is. No, I think, your honor, if your effort is to try to coerce people to take the vaccine against their religious beliefs, and it's unsuccessful, and you have difficulty running a hospital because of that lack of success, then there still is a very strong... Okay, I misunderstood. Are you saying that the record... I just didn't understand the record at that level of detail. You're saying the record shows that a campaign of coercion resulted in all of the nurses getting vaccinated and boosted? Some nurses did get... And some employees did get vaccinated after... Okay, what about the some? Does that mean some did not? Correct. Okay, and they were invited back? And those 300 were invited back, yes, your honor. Well, if those 300 were invited back and they did not get vaccinated, how can your client show discrimination on the basis of his religion? Your honor, because he's a member of a protected class. His job performance met his employer's legitimate... So were the 300. Yes, but my client was not brought back. So he... Right, so there may be some reason he wasn't brought back, but what I'm getting at is it's not his religion. It's some other reason. It may be a protected... We disagree, your honor. We disagree. We think that he has a prima facie case of retaliation because there is no... He sought a religious exemption. He was denied the religious exemption. That... His religion is the only reason that he's not employed. And... I get the theory, but how do you align that with the nurses? Your honor, because at some point, the religious prejudice was obviously overcome and those nurses were brought back. But it's completely inconsistent with everything that the defendants have said about the reasons that they took their adverse employment action in the first place, which they said was risk, but which they have no evidence of that. And that allegation of risk is completely destroyed by the fact that they're bringing back nurses that are working with the tiniest and most vulnerable members or patients in the PICU. Okay, we'll give you a minute. Can I ask one follow-up, please? Sure, sure. Thank you. Mr. Bach, if I heard you right, you just said that one of your claimed injuries here is that you were coerced into violating, or your client was coerced into violating his religious convictions. This is a... There was an effort to do that. Is that one of your claimed injuries? There... That there was an effort to do that. He did not violate his conscience. Is that... This is a Title VII employment discrimination case. Is that the type of harm that this circuit has ever recognized in a Title VII case? You're not bringing a pre-exercise or other religious-based claim. This is purely Title VII employment discrimination. Understood, Your Honor. And the harm of coercion went to our presumption argument. And what we're seeking redress for is restoring Dr. Halchenko to his employment. He lost his job. And for the other clients, they haven't been repaid wages for the period of time that they were out of work after they were put on suspension without pay as a result of not having their religious exemptions granted. So your claimed irreparable harm is the loss of job and loss of employment skills, not being coerced into violating or attempted coercion to the argument that we presented to the court. The per se harm that we believe this court could find and similar to what the Fifth Circuit recently found in the Sombrano case. Has this circuit ever recognized that as a type of harm for employment discrimination? This circuit has not. The Fifth Circuit recently did. Thank you. Okay, very well. Mr. Bach, we'll give you the minute you asked for in rebuttal, but let's shift over to counsel for ascension. Thank you, Your Honor. May it please the court. My name is Patty Pryor and I'm here on behalf of the appellees. I think it's important to point out to start that we're here virtually today because this court's own rules, even today, require individuals who appear before it to be vaccinated. It should come as no surprise then that in the fall of 2021, when we were still dealing with the deadly Delta variant, when cases were surging, that the hospital where Dr. Halsenko worked as a doctor in the pediatric intensive care unit also had a vaccination requirement. And unlike this court where unvaccinated individuals can participate remotely, Dr. Halsenko could not treat the sickest of sick youth remotely. Before we get to the merits, can I just confirm please that you agree that he has now exhausted his administrative remedies? It's my understanding that there has been a notice of right to sue received, yes. Thank you. Thank you. Yeah. You know, as opposing counsel pointed out, you know, Dr. Halsenko's job was to deal with these very, very ill individuals to treat their heart, their lungs, their, you know, put in catheters, put in breathing tubes. At that time, at the time the decision was made, the EEOC, OSHA, CDC, and CMS identified the heightened risk that unvaccinated individuals posed themselves and others. Did your client, or what I guess I could just say, what's the record show? Did your client agree to bring or similar units without requiring vaccination? There was, so this has been, as you guys know, this has been an evolving pandemic. As more information came out in late, I think it was in December time period, my understanding is that some nurses were brought back, a little bit different than doctors, but no, we have not yet. Unvaccinated nurses? Unvaccinated nurses with protections, yes, were brought back. Now, at that time, things had changed since November. So, as you might know, in November, CMS had just come out with this new rule where they said that this is a heightened risk, right? Supreme Court kind of upheld that different than OSHA because of that heightened risk. What changed by December was in November, there was OSHA, there was CMS, there were a number of things that not only increased the risk, but also increased the burden on the hospital, because there would be need to be compliance with OSHA testing requirements and other things. Some of that all went away. By December, a lot of that had been stayed, including the CMS rule. And so, one of the things that, keep in mind that this is a religious accommodation issue, it's a de minimis standard, okay? And the de minimis standard means just a slight risk, a slight hardship has to be shown. That does not mean it's impossible for an employer to allow and to accommodate, right? They're not required, if at all costs they could do it, they have to do it. That's not the requirement at all. So they can, and this is in our briefs, they can accommodate some and not be required to accommodate others. They can choose to take on that undue burden. But I think what's important today, you know, I started off with that to kind of point out where we are, but what we're here for today is a preliminary injunction. And in order for them to, that was denied, in order for him to prove his case, he's got to show clear error with the judge's decision. And based on a mountain of Seventh Circuit precedent, which I think your clear error here, there is no irreparable harm in employment cases. There is no irreparable harm here where he claims that he's had atrophy, because as you all pointed out, that time period has already expired. Based on his statements, I think it's even hard to put him back in the job because he's publicly now stated that he would not be able to perform his job at this point. There also is no, there is definitely an adequate remedy of laws that as the district court pointed out, you can employ, you can recover at the end of the day. He could have training to get back up to skill. Those are things the court can order. This is not, you know, to opposing counsel's statement about this presumed or it should be assumed because the religion is involved. That is not the law, one. Two, unlike a constitutional claim, which is how he tries to loop this in, the constitution does not require accommodation. It prohibits you from treating people differently based on religion, but there is no treating anyone differently because of religion. Individuals unvaccinated, all of which were let out, the only ones who were brought back were ones who had religious accommodation requests. So this is not a constitutional claim in any matter, not to mention the fact that it's a private employer. More importantly, um, you know, the, he's, he's points out to this fifth circuit case. The first circuit just addressed that case in the together employees case. It was a case that just, just as was decided a month ago and they rejected a similar argument together employees versus mass general Brigham. It's 2022 us app Lexus one, one, three, seven, nine. In, in that case, what they said was in a very similar case to this, when there's already been a termination as there has been here, that fifth circuit case does not apply. And even the fifth circuit, the same brand of case, which, which, um, opposing house was, is alluding to, they said that if this had been about stopping a termination, it would not apply. There would not be any need for an injunctive relief there. It was only because there was continuing pressure on the individual to try to get them vaccinated. The employer there kept them employed, but just wouldn't pay them, wouldn't let them work. And so it was to continue to kind of pressure them to, to, um, to go against their religious beliefs here, termination occurred in the court. In that case said in lawsuits, alleging wrongful termination or adverse employment action, the plaintiff is ordinarily not irreparably harmed. That's because the statutory relief available conclusion of a successful lawsuit can adequately compensate the planet for the employer's wrongful conduct. It's exactly what we have here. This termination has already occurred. The court in that case recognized in the plaintiffs in that case, recognized that if they were trying to get injunctive relief to stop a termination, the Sampson case, the Supreme court case would have stopped them. And that's what the first circuit held here recently in the together employees versus mass general Brigham. All in all in some, at the end of the day, we're here on a preliminary injunction motion. We're here. He's got to show that there is a clear error of law or fact he hasn't. The court below found that it was speculative based on the evidence that there was any kind of irreparable harm. I think your honors have already proven that today. This, this idea or estimate as he calls it in terms of when his, his skills might atrophy. And I would think it's also speculative belief. He couldn't relearn them because obviously the skills were learned at one point to begin with. And in fact, his affidavit talks about after training and skills, that it's the same thing he would have here. There's simply just no evidence of any kind of clear error of law or fact on either the harm or on the lack of adequate remedies issue that he needs to establish. We would respectfully request that the court firm. Thank you, Ms. Pryor. Mr. Bach, give you a minute for rebuttal. Your honor, Judge Scudder asked about the unvaccinated nurses and Ms. Pryor's response was that they're a little bit different than, than doctors. I direct the court to document 38 seven in the district court record, which is the declaration of Kristen Evans. She's an extra corporeal membrane oxygenation or ECMO specialists. ECMO is a heart lung bypass that allows the ECMO machine to oxygenate the patient's blood. Nurse Evans testified. ECMO is a bridge between death and life. And the direction the child travels on that bridge depends in part upon each of us on the team. Dr. Halchenko along with nurse Evans was on that ECMO team. St. Vincent brought back nurse Evans to provide ECMO care to the tiniest weakest and most at risk patients. If it was not undue hardship to bring back nurse Evans, it cannot be undue hardship to bring back Dr. Halchenko. Thank you. Mr. Bach, thanks to you. Ms. Pryor, thanks to you. We'll take the appeal under the advisement.